**1722-CC00761**

Electronically Filed - City of St. Louis - March 14, 2017 - 10:45 AM

IN THE CIRCUIT COURT OF THE CITY OF ST. LOUIS
STATE OF MISSOURI

| | |
|---|---|
| SHERLENE WARD AND JAMES ABBOTT, | ) |
| | ) |
| VICTOR HERNANDEZ AND ROBERT WETZ, | ) |
| | ) |
| KERRY G. WATTS, | ) |
| | ) |
| JACK HEIDEMAN, | ) |
| | ) |
| SUSAN HIGGINS AND CHARLES DIXON, | ) |
| | ) |
| CINDI WAYNICK, | ) |
| | ) |
| RENEE I. GALL, | ) |
| | ) |
| DAVID KELLY JR. AND DAVID L. KELLY, | ) |
| | ) |
| MICHAEL AND DENISE HOEING, | ) |
| | ) |
| TINA HOERNER, | ) |
| | ) |
| ALAN AND MARGARET GOEBEL, | ) |
| | ) |
| CHARLES AND KRISTIN JOHNSON, | ) |
| | ) |
| STUART AND SHAWN HOLIDAY, | ) |
| | ) |
| TERRY L. SMITH, | ) |
| | ) |
| JACQUELINE AND TEWFIC SAFIEH, | ) |
| | ) |
| KATHI EDWARD, | ) |
| | ) |
| RAYMON AND CHERYL HOWARD, | ) |
| | ) |
| SHIRLEY HOYLA, | ) |
| | ) |
| LISA AND JOHN W. HAMMOCK JR., | ) |

CASE NO.

JURY TRIAL DEMANDED

Electronically Filed - City of St. Louis - March 14, 2017 - 10:45 AM

**SANDY ALLEN HUDSON AND**                )
**PREMLATA RAWAT HUDSON,**                )
                                           )
**DIANA WROBLEWSKI AND**                   )
**LAURENCE J. BURNS,**                     )
                                           )
**KURT AND ADELE HYSEN,**                  )
                                           )
**JOANNE IANNUCCI,**                       )
                                           )
**PATRICIA JACKSON,**                      )
                                           )
**WAYNE AND CATHERINE JAMES,**             )
                                           )
**DEBERA JASPER AND LONNIE DAVIS**,        )
                                           )
**JACQUELINE AND WILLIE JOHNSON,**         )
                                           )
**BRANDON JOHNSON,**                       )
                                           )
**JAMAAL JOHNSON,**                        )
                                           )
**RICHARD JOHNSON AND DIANE**              )
**HAYNE-JOHNSON,**                         )
                                           )
**ROBERT AND FRANCES JOHNSON,**            )
                                           )
**SANDRA JOLLY,**                          )
                                           )
**RONALD JUMPER,**                         )
                                           )
**EVELYN KASTAN,**                         )
                                           )
**BRYAN AND EUNICE KENYON,**               )
                                           )
**MAJEED AND AMY KHAN,**                   )
                                           )
**MICHAEL AND KIMBERLY KLEIN,**            )
                                           )
**BRAD KLIEWER,**                          )
                                           )
**STANKO KNEZEVIC,**                       )
                                           )
**RAY KOLOSA,**                            )
                                           )
**GERALD AND GWEN KRAMER,**                )

Electronically Filed - City of St. Louis - March 14, 2017 - 10:45 AM

|  |  |
|---|---|
| **BRUCE AND RUTH LAW,** | ) |
|  | ) |
| **STEPHEN AND SHARON LEE,** | ) |
|  | ) |
| **MARY AND WARREN LEE,** | ) |
|  | ) |
| **DONALD AND MINH DUNG LEQUIEU,** | ) |
|  | ) |
| **GREGORY LEWIS,** | ) |
|  | ) |
| **ROCKY AND LAURA LOGGINS,** | ) |
|  | ) |
| **PAUL LOIDOLT,** | ) |
|  | ) |
| **ALLEN AND LOIS LYNN,** | ) |
|  | ) |
| **LARRY AND SUSAN MACZKO,** | ) |
|  | ) |
| **BROOK R. MADDEN,** | ) |
|  | ) |
| **CHAD AND JODY MAGSTADT.** | ) |
|  | ) |
| *Plaintiffs,* | ) |
| **VS.** | ) |
|  | ) |
|  | ) |
| **MONSANTO COMPANY,** | ) |
| Serve:  CSC-Lawyers Inc. Service Co. | ) |
|          221 Bolivar Street | ) |
|          Jefferson City, MO 65101 | ) |
|  | ) |
| **OSBORN & BARR COMMUNICATIONS, INC.,** | ) |
| Serve:  Rhonda Ries Aguilar | ) |
|          Registered Agent | ) |
|          914 Spruce Street | ) |
|          St. Louis, MO 63102 | ) |
|  | ) |
| **OSBORN & BARR HOLDINGS, INC.,** | ) |
| Serve:  Rhonda Ries Aguilar | ) |
|          Registered Agent | ) |
|          914 Spruce Street | ) |
|          St. Louis, MO 63102 | ) |
|  | ) |
| *Defendants.* | ) |

Electronically Filed - City of St. Louis - March 14, 2017 - 10:45 AM

)
_____

## COMPLAINT

COME NOW Plaintiffs, by and through their counsel, Onder, Shelton, O'Leary & Peterson, LLC, and for their cause of action against Defendants Monsanto Company, Osborn & Barr Communications, Inc. and Osborn & Barr Holdings, Inc., state to the Court as follows:

## I.      INTRODUCTION

1.      Plaintiffs bring this cause of action against Defendant pursuant to Rule 52.05(a) of the Missouri Rules of Civil Procedure, as their claims arise out of the same series of transactions and occurrences, and their claims involve common questions of law and/or fact.  All claims in this action are a direct and proximate result of Defendants' negligent, willful, and wrongful conduct in connection with the design, development, manufacture, testing, packaging, promoting, marketing, distribution, and/or sale of the products as Roundup®.  All Plaintiffs in this action seek recovery for damages as a result of developing Non-Hodgkin's Lymphoma ("NHL"), which was directly and proximately caused by such wrongful conduct by Defendant, the unreasonably dangerous and defective nature of Roundup®, and its active ingredient, glyphosate, and the attendant effects of developing NHL. No Plaintiff knew of an association between exposure to Roundup® and the increased risk of developing NHL until well after July 29, 2015, when the International Agency for Research on Cancer ("IARC"), an agency of the World Health Organization ("WHO"), first published its evaluation of glyphosate.  All of the claims involve common questions of law and fact and share legal and medical issues that arise out of all of the Plaintiffs' exposures to Roundup®.

## II.      THE PARTIES

2.      Plaintiff Sherlene Ward is and was at all relevant times a resident of Ohio. She purchased and used Roundup and/or other Monsanto glyphosate-containing products ("Roundup") from 1986 through approximately 2002, and was diagnosed with non Hodgkins

Electronically Filed - City of St. Louis - March 14, 2017 - 10:45 AM

Lymphoma in 2012.  Plaintiff Sherlene Ward is and was at all relevant times the spouse of James W. Abbott.

3.      Plaintiff Victor Hernandez is and was at all relevant times a resident of Texas and is the next of kin for Robert J. Wetz, deceased. Robert Wetz purchased and used Roundup and/or other Monsanto glyphosate-containing products ("Roundup") from 2004 through approximately 2013, and was diagnosed with non Hodgkins Lymphoma in 2013.

4.      Plaintiff Kerry Watts is and was at all relevant times a resident of Idaho. She purchased and used Roundup and/or other Monsanto glyphosate-containing products ("Roundup") from the 2012 through approximately 2013, and was diagnosed with non Hodgkins Lymphoma in 2013.

5.      Plaintiff Jack Hiedeman is and was at all relevant times a resident of Minnesota. He purchased and used Roundup and/or other Monsanto glyphosate-containing products ("Roundup") from 2005 through present, and was diagnosed with non Hodgkins Lymphoma in 2011.

6.      Plaintiff Susan Higgins is and was at all relevant times a resident of West Virginia and is the surviving daughter and next of kin for Charles E. Dixon, deceased.  Charles E. Dixon purchased and used Roundup and/or other Monsanto glyphosate-containing products ("Roundup") from 1970's through approximately 2008, and was diagnosed with non Hodgkins Lymphoma in 2004, 2008, and 2009.

7.      Plaintiff Cindi L. Waynick is and was at all relevant times a resident of Ohio.  She purchased and used Roundup and/or other Monsanto glyphosate-containing products ("Roundup") from approximately 2006 through 2016, and was diagnosed with non Hodgkins Lymphoma in 2013.

Electronically Filed - City of St. Louis - March 14, 2017 - 10:45 AM

8.      Plaintiff Renee Gall is and was at all relevant times a resident of Minnesota. She purchased and used Roundup and/or other Monsanto glyphosate-containing products ("Roundup") from approximately 1970 through 2007, and was diagnosed with non Hodgkins Lymphoma in 1997.

9.      Plaintiff David Kelly Jr. is and was at all relevant times a resident of North Carolina and is the next of kin for David Lawrence Kelly, deceased. David Lawrence Kelly purchased and used Roundup and/or other Monsanto glyphosate-containing products ("Roundup") prior to his diagnosis and eventual death from non Hodgkins Lymphoma in 1999.

10.     Plaintiff Michael Hoeing is and was at all relevant times a resident of Indiana.  He purchased and used Roundup and/or other Monsanto glyphosate-containing products ("Roundup") from 1990 through 2016, and was diagnosed with non Hodgkins Lymphoma in 1999.  Plaintiff Michael Hoeing is and was at all relevant times the spouse of Denise Hoeing.

11.     Plaintiff Tina Hoerner is and was at all relevant times a resident of Pennsylvania. She purchased and used Roundup and/or other Monsanto glyphosate-containing products ("Roundup") from 2000 through 2011, and was diagnosed with non Hodgkins Lymphoma in 2011.

12.     Plaintiff Alan Goebel is and was at all relevant times a resident of Illinois.  He purchased and used Roundup and/or other Monsanto glyphosate-containing products ("Roundup") for the last 26 years, and was diagnosed with non Hodgkins Lymphoma in 2008. Plaintiff Alan Goebel is and was at all relevant times the spouse of Margaret A. Goebel.

13.     Plaintiff Charles A. Johnson Jr. is and was at all relevant times a resident of Georgia.   He purchased and used Roundup and/or other Monsanto glyphosate-containing products ("Roundup") prior to his diagnosis and was diagnosed with non Hodgkins Lymphoma

Electronically Filed - City of St. Louis - March 14, 2017 - 10:45 AM

in 2013. Plaintiff Charles A. Johnson Jr. is and was at all relevant times the spouse of Kristin Johnson.

14.     Plaintiff Stuart Holiday is and was at all relevant times a resident of Kansas.  He purchased and used Roundup and/or other Monsanto glyphosate-containing products ("Roundup") from 2000 through 2015, and was diagnosed with non Hodgkins Lymphoma in 2013.  Plaintiff Stuart Holiday is and was at all relevant times the spouse of Shawn Holiday.

15.     Plaintiff Terry L. Smith is and was at all relevant times a resident of Wisconsin. He purchased and used Roundup and/or other Monsanto glyphosate-containing products ("Roundup") everyday for one month in the mid-1990's, and was diagnosed with non Hodgkins Lymphoma in 2001.

16.     Plaintiff Jacqueline Safieh is and was at all relevant times a resident of California. She purchased and used Roundup and/or other Monsanto glyphosate-containing products ("Roundup") from 2006 through 2016, and was diagnosed with non Hodgkins Lymphoma in 2015.  Plaintiff Jacqueline Safieh is and was at all relevant times the spouse of Tewfic Safieh.

17.     Plaintiff Kathi Edward is and was at all relevant times a resident of California. She purchased and used Roundup and/or other Monsanto glyphosate-containing products ("Roundup") through approximately 2002 and was diagnosed with non Hodgkins Lymphoma in 2001.

18.     Plaintiff Raymon L. Howard is and was at all relevant times a resident of California. He purchased and used Roundup and/or other Monsanto glyphosate-containing products ("Roundup") from 1986 through 2008, and was diagnosed with non Hodgkins Lymphoma in 2008.  Plaintiff Raymon L. Howard is and was at all relevant times the spouse of Cheryl Howard.

Electronically Filed - City of St. Louis - March 14, 2017 - 10:45 AM

19.     Plaintiff Shirley Hoyla is and was at all relevant times a resident of Iowa. She purchased and used Roundup and/or other Monsanto glyphosate-containing products ("Roundup") from the 1992 through 2009, and was diagnosed with non Hodgkins Lymphoma in 2009.

20.     Plaintiff Lisa Hammock is and was at all relevant times a resident of Georgia and is the surviving spouse for John W. Hammock Jr., deceased. John W. Hammock Jr. purchased and used Roundup and/or other Monsanto glyphosate-containing products ("Roundup") from 1975 through 2008, and was diagnosed with non Hodgkins Lymphoma in 2001.

21.     Plaintiff Sandy A. Hudson is and was at all relevant times a resident of California. He purchased and used Roundup and/or other Monsanto glyphosate-containing products ("Roundup") from 1980 through 2016, and was diagnosed with non Hodgkins Lymphoma in 2003. Plaintiff Sandy A. Hudson is and was at all relevant times the spouse of Premlata Rawat Hudson.

22.     Plaintiff Diana Wroblewski is and was at all relevant times a resident of Michigan and is the daughter and next of kin for Laurence J. Burns, deceased.  Laurence J. Burns purchased and used Roundup and/or other Monsanto glyphosate-containing products ("Roundup") from the 1970s through approximately 2007, and was diagnosed with non Hodgkins Lymphoma in 2007.

23.     Plaintiff Kurt Hysen is and was at all relevant times a resident of California. He purchased and used Roundup and/or other Monsanto glyphosate-containing products ("Roundup") from the 2004 through present, and was diagnosed with non Hodgkins Lymphoma in the 2006.  Plaintiff Kurt Hysen is and was at all relevant times the spouse of Adele Hysen.

Electronically Filed - City of St. Louis - March 14, 2017 - 10:45 AM

24.     Plaintiff JoAnne Iannucci is and was at all relevant times a resident of Ohio. She purchased and used Roundup and/or other Monsanto glyphosate-containing products ("Roundup") from 2010 through 2014, and was diagnosed with non Hodgkins Lymphoma in 2012.

25.     Plaintiff Patricia Jackson is and was at all relevant times a resident of Texas.  She purchased and used Roundup and/or other Monsanto glyphosate-containing products ("Roundup") from 2000 through 2012, and was diagnosed with non Hodgkins Lymphoma in 2004.

26.     Plaintiff Wayne James is and was at all relevant times a resident of Nevada. He purchased and used Roundup and/or other Monsanto glyphosate-containing products ("Roundup") from 1989 through 2016, and was diagnosed with non Hodgkins Lymphoma in 2009.  Plaintiff Wayne James is and was at all relevant times the spouse of Catherine James.

27.     Plaintiff Debera Jasper is and was at all relevant times a resident of Utah and is mother and next of kin for Lonnie Davis, deceased. Lonnie Davis purchased and used Roundup and/or other Monsanto glyphosate-containing products ("Roundup") prior to his diagnosis, and was diagnosed with non Hodgkins Lymphoma in 1989 and eventual death in 1999.

28.     Plaintiff Jacqueline Johnson is and was at all relevant times a resident of North Carolina and is next of kin for Willie Johnson, deceased. Willie Johnson purchased and used Roundup and/or other Monsanto glyphosate-containing products ("Roundup") from 1979 through 2013, and was diagnosed with non Hodgkins Lymphoma in 2012 and eventual death in 2014.

29.     Plaintiff Brandon Johnson is and was at all relevant times a resident of Indiana. He purchased and used Roundup and/or other Monsanto glyphosate-containing products

Electronically Filed - City of St. Louis - March 14, 2017 - 10:45 AM

("Roundup") from the early 1990's through 2015, and was diagnosed with non Hodgkins Lymphoma in 2004.

30.     Plaintiff Jamaal Johnson is and was at all relevant times a resident of California. He purchased and used Roundup and/or other Monsanto glyphosate-containing products ("Roundup") from 2007 through 2009, and was diagnosed with non Hodgkins Lymphoma in 2011.

31.     Plaintiff Richard Johnson is and was at all relevant times a resident of California. He purchased and used Roundup and/or other Monsanto glyphosate-containing products ("Roundup") from the 1980's through 2010, and was diagnosed with non Hodgkins Lymphoma in 2010.  Plaintiff Richard Johnson is and was at all relevant times the spouse of Diane Hayne-Johnson.

32.     Plaintiff Robert Johnson is and was at all relevant times a resident of Virginia. He purchased and used Roundup and/or other Monsanto glyphosate-containing products ("Roundup") from 1991 through present, and was diagnosed with non Hodgkins Lymphoma in 1998.  Plaintiff Robert Johnson is and was at all relevant times the spouse of Frances Johnson.

33.     Plaintiff Sandra Jolly is and was at all relevant times a resident of Ohio. She purchased and used Roundup and/or other Monsanto glyphosate-containing products ("Roundup") prior to her diagnosis, and was diagnosed with non Hodgkins Lymphoma in 2001.

34.     Plaintiff Ronald Jumper is and was at all relevant times a resident of Pennsylvania. He purchased and used Roundup and/or other Monsanto glyphosate-containing products ("Roundup") prior to his diagnosis, and was diagnosed with non Hodgkins Lymphoma in 2013.

Electronically Filed - City of St. Louis - March 14, 2017 - 10:45 AM

35.    Plaintiff Evelyn Kastan is and was at all relevant times a resident of California. She purchased and used Roundup and/or other Monsanto glyphosate-containing products ("Roundup") from 1984 through present, and was diagnosed with non Hodgkins Lymphoma in 1989.

36.    Plaintiff Bryan Kenyon is and was at all relevant times a resident of Oregon. He purchased and used Roundup and/or other Monsanto glyphosate-containing products ("Roundup") from 1975 through present, and was diagnosed with non Hodgkins Lymphoma in 1985. Plaintiff Bryan Kenyon is and was at all relevant times the spouse of Eunice Kenyon.

37.    Plaintiff Majeed M. Khan is and was at all relevant times a resident of Illinois. He purchased and used Roundup and/or other Monsanto glyphosate-containing products ("Roundup") from 2004 through 2015, and was diagnosed with non Hodgkins Lymphoma in 2013. Plaintiff Majeed M. Khan is and was at all relevant times the spouse of Amy Khan.

38.    Plaintiff Michael Klein is and was at all relevant times a resident of Illinois. He purchased and used Roundup and/or other Monsanto glyphosate-containing products ("Roundup") from 1981 through 1993, and was diagnosed with non Hodgkins Lymphoma in 2003. Plaintiff Michael Klein is and was at all relevant times the spouse of Kimberly Klein.

39.    Plaintiff Brad Kliewer is and was at all relevant times a resident of Oregon. He purchased and used Roundup and/or other Monsanto glyphosate-containing products ("Roundup") from 1990 through present, and was diagnosed with non Hodgkins Lymphoma in 2005.

40.    Plaintiff Stanko Knezevic is and was at all relevant times a resident of California. He purchased and used Roundup and/or other Monsanto glyphosate-containing products

Electronically Filed - City of St. Louis - March 14, 2017 - 10:45 AM

("Roundup") from 2009 through 2011, and was diagnosed with non Hodgkins Lymphoma in 2010.

41.     Plaintiff Ray Kosola is and was at all relevant times a resident of California. He purchased and used Roundup and/or other Monsanto glyphosate-containing products ("Roundup") from 1991 through 2013, and was diagnosed with non Hodgkins Lymphoma in 2013.

42.     Plaintiff Gerald Kramer is and was at all relevant times a resident of Iowa. He purchased and used Roundup and/or other Monsanto glyphosate-containing products ("Roundup") from 1980 through 2012, and was diagnosed with non Hodgkins Lymphoma in 2012. Plaintiff Gerald Kramer is and was at all relevant times the spouse of Gwen Kramer.

43.     Plaintiff Bruce T. Law is and was at all relevant times a resident of Arizona. He purchased and used Roundup and/or other Monsanto glyphosate-containing products ("Roundup") from 1980 through 2012, and was diagnosed with non Hodgkins Lymphoma in late 2012 or early 2013. Plaintiff Bruce T. Law is and was at all relevant times the spouse of Ruth C. Law.

44.     Plaintiff Stephen Lee is and was at all relevant times a resident of Alabama. He purchased and used Roundup and/or other Monsanto glyphosate-containing products ("Roundup") from 1980 through present, and was diagnosed with non Hodgkins Lymphoma in 1994. Plaintiff Stephen Lee is and was at all relevant times the spouse of Sharon Lee.

45.     Plaintiff Mary Lee is and was at all relevant times a resident of Nevada and is the surviving spouse and next of kin for Warren Lee, deceased. Warren Lee purchased and used Roundup and/or other Monsanto glyphosate-containing products ("Roundup") from 1992

Electronically Filed - City of St. Louis - March 14, 2017 - 10:45 AM

through 2014, and was diagnosed with non Hodgkins Lymphoma in 2013 and eventual death in 2014.

46.     Plaintiff Donald Lequieu is and was at all relevant times a resident of California. He purchased and used Roundup and/or other Monsanto glyphosate-containing products ("Roundup") from 1990 through 2000, and was diagnosed with non Hodgkins Lymphoma in 2012. Plaintiff Donald Lequieu is and was at all relevant times the spouse of Minh Dung Lequieu.

47.     Plaintiff Gregory Lewis is and was at all relevant times a resident of Illinois. He purchased and used Roundup and/or other Monsanto glyphosate-containing products ("Roundup") from 1996 through present, and was diagnosed with non Hodgkins Lymphoma in 2014.

48.     Plaintiff Rocky Loggins is and was at all relevant times a resident of Texas. He purchased and used Roundup and/or other Monsanto glyphosate-containing products ("Roundup") from 1995 through 2015, and was diagnosed with non Hodgkins Lymphoma in 1999.  Plaintiff Rocky Loggins is and was at all relevant times the spouse of Laura Loggins.

49.     Plaintiff Paul Loidolt is and was at all relevant times a resident of Minnesota. He purchased and used Roundup and/or other Monsanto glyphosate-containing products ("Roundup") from the early 1974 through 1980, and was diagnosed with non Hodgkins Lymphoma in 1985.

50.     Plaintiff Allen Lynn is and was at all relevant times a resident of Oregon. He purchased and used Roundup and/or other Monsanto glyphosate-containing products ("Roundup") from 1982 through present, and was diagnosed with non Hodgkins Lymphoma in 2009.  Plaintiff Allen Lynn is and was at all relevant times the spouse of Lois Lynn.

Electronically Filed - City of St. Louis - March 14, 2017 - 10:45 AM

51.     Plaintiff Larry Maczko is and was at all relevant times a resident of West Virginia. He purchased and used Roundup and/or other Monsanto glyphosate-containing products ("Roundup") from 1976 through 2006, and was diagnosed with non Hodgkins Lymphoma in 2005. Plaintiff Larry Maczko is and was at all relevant times the spouse of Susan Maczko.

52.     Plaintiff Brook R. Madden is and was at all relevant times a resident of Oregon. She purchased and used Roundup and/or other Monsanto glyphosate-containing products ("Roundup") from 1980 through 2015, and was diagnosed with non Hodgkins Lymphoma in 2014.

53.     Plaintiff Chad Magstadt is and was at all relevant times a resident of Illinois. He purchased and used Roundup and/or other Monsanto glyphosate-containing products ("Roundup") from 1985 through approximately 1993, and was diagnosed with non Hodgkins Lymphoma in 2013. Plaintiff Chad Magstadt is and was at all relevant times the spouse of Jody Magstadt.


**Defendants**

54.     Defendant Monsanto Company ("Monsanto") is a Delaware corporation with its headquarters and principal place of business in St. Louis, Missouri and is a "local defendant" for purposes of Removal and Diversity Jurisdiction.  At all relevant times, Monsanto also regularly conducted, transacted, and solicited business in St. Louis, Missouri, as well as in all States of United States.

55.     At all times relevant to this complaint, Monsanto was the entity that discovered the herbicidal properties of glyphosate and the manufacturer of Roundup®.

Electronically Filed - City of St. Louis - March 14, 2017 - 10:45 AM

56.     Defendant Osborn & Barr Communications, Inc. is a Missouri corporation with its headquarters and principal place of business in St. Louis, Missouri with its registered agent located in the City of St. Louis, at 914 Spruce Street, St. Louis, Missouri 63102 and is a "local defendant" for purposes of Removal and Diversity Jurisdiction.

57.     Defendant Osborn & Barr Holdings, Inc. is a Missouri corporation with its headquarters and principal place of business in St. Louis, Missouri with its registered agent located in the City of St. Louis, at 914 Spruce Street, St. Louis, Missouri 63102 and is a "local defendant" for purposes of Removal and Diversity Jurisdiction.

58.     Osborn & Barr Communications, Inc. and Osborn & Barr Holdings, Inc. (hereinafter collectively "Osborn & Barr") was responsible for marketing Roundup and related Monsanto products until approximately 2012.  Upon information and belief, important advertising, marketing, sales and other business decisions regarding Roundup® were made from and in the State of Missouri.

59.     The expiration of any applicable statute of limitations is equitably tolled by reason of Monsanto's fraudulent misrepresentations and fraudulent concealment, detailed more fully below.

### III. BACKGROUND

60.     In 1970, Defendant Monsanto Company, Inc. discovered the herbicidal properties of glyphosate and began marketing it in products in 1974 under the brand name Roundup®. Roundup® is a non-selective herbicide used to kill weeds that commonly compete with the growing of crops. By 2001, glyphosate had become the most-used active ingredient in American agriculture with 85–90 millions of pounds used annually. That number grew to 185 million pounds by 2007.  As of 2013, glyphosate was the world's most widely used herbicide.

Electronically Filed - City of St. Louis - March 14, 2017 - 10:45 AM

61.    Monsanto is a multinational agricultural biotechnology corporation based in St. Louis, Missouri. It is the world's leading producer of glyphosate. As of 2009, Monsanto was the world's leading producer of seeds, accounting for 27% of the world seed market. The majority of these seeds are of the Roundup Ready® brand. The stated advantage of Roundup Ready® crops is that they substantially improve a farmer's ability to control weeds, since glyphosate can be sprayed in the fields during the growing season without harming their crops. In 2010, an estimated 70% of corn and cotton, and 90% of soybean fields in the United States were Roundup Ready®.

62.    Monsanto's glyphosate products are registered in 130 countries and approved for use on over 100 different crops. They are ubiquitous in the environment. Numerous studies confirm that glyphosate is found in rivers, streams, and groundwater in agricultural areas where Roundup® is used. It has been found in food, in the urine of agricultural workers, and even in the urine of urban dwellers who are not in direct contact with glyphosate.

63.    On March 20, 2015, the International Agency for Research on Cancer ("IARC"), an agency of the World Health Organization ("WHO"), issued an evaluation of several herbicides, including glyphosate. That evaluation was based, in part, on studies of exposures to glyphosate in several countries around the world, and it traces the health implications from exposure to glyphosate since 2001.

64.    On July 29, 2015, IARC issued the formal monograph relating to glyphosate. In that monograph, the IARC Working Group provides a thorough review of the numerous studies and data relating to glyphosate exposure in humans.

65.    The IARC Working Group classified glyphosate as a Group 2A herbicide, which means that it is probably carcinogenic to humans. The IARC Working Group concluded that the

Electronically Filed - City of St. Louis - March 14, 2017 - 10:45 AM

cancers most associated with glyphosate exposure are non-Hodgkin lymphoma and other haematopoietic cancers, including lymphocytic lymphoma/chronic lymphocytic leukemia, B-cell lymphoma, and multiple myeloma.

66.     The IARC evaluation is significant. It confirms what has been believed for years: that glyphosate is toxic to humans.

67.     Nevertheless, Monsanto, since it began selling Roundup®, has represented it as safe to humans and the environment. Indeed, Monsanto and has repeatedly proclaimed and continues to proclaim to the world, and particularly to United States consumers, that glyphosate-based herbicides, including Roundup®, create no unreasonable risks to human health or to the environment.

68.     Osborn & Barr marketed Roundup for two decades, representing it as safe to humans and the environment, disseminating advertising and other marketing efforts that proclaim to Roundup users and potential Roundup users that the products create no unreasonable risks to human health or to the environment.

## IV.     JURISDICTION AND VENUE

69.     At all times relevant hereto, Monsanto was in the business of researching, designing, formulating, compounding, testing, manufacturing, producing, processing, assembling, inspecting, distributing, labeling and packaging and Monsanto and Osborn & Barr were in the business of marketing, promoting, and/or advertising Roundup® products in the State of Missouri and the City of St. Louis.

70.     At all times relevant hereto, Monsanto was a Delaware corporation with its headquarters and principal place of business in St. Louis, Missouri, and therefore is a local defendant for purposes of Removal and diversity jurisdiction.

Electronically Filed - City of St. Louis - March 14, 2017 - 10:45 AM

71.     At all times relevant hereto, Osborn & Barr was a Missouri corporation with its headquarters and principal place of business in St. Louis, Missouri, and therefore is a local defendant for purposes of Removal and diversity jurisdiction.

72.     Plaintiffs have timely filed this lawsuit less than two years from the time the Plaintiffs knew or reasonably knew of the injury and that it may have been wrongfully caused.

73.     Pursuant to R.S.Mo. §508.010(5)(1), venue is proper within this Court because Plaintiffs were injured outside the state of Missouri and two of the Defendants maintain their registered agent within the city of St. Louis.

**V.     FACTS**

74.     Glyphosate is a broad-spectrum, non-selective herbicide used in a wide variety of herbicidal products around the world.

75.     Plants treated with glyphosate translocate the systemic herbicide to their roots, shoot regions and fruit, where it interferes with the plant's ability to form aromatic amino acids necessary for protein synthesis. Treated plants generally die within two to three days. Because plants absorb glyphosate, it cannot be completely removed by washing or peeling produce or by milling, baking, or brewing grains.

76.     For nearly 40 years, farms across the world have used Roundup® without knowing of the dangers its use poses. That is because when Monsanto first introduced Roundup®, it touted glyphosate as a technological breakthrough: it could kill almost every weed without causing harm either to people or to the environment. Of course, history has shown that not to be true. According to the WHO, the main chemical ingredient of Roundup®— glyphosate—is a probable cause of cancer. Those most at risk are farm workers and other individuals with workplace exposure to Roundup®, such as workers in garden centers, nurseries,

Electronically Filed - City of St. Louis - March 14, 2017 - 10:45 AM

and landscapers. Agricultural workers are, once again, victims of corporate greed. Monsanto assured the public that Roundup® was harmless. In order to prove this, Monsanto championed falsified data and attacked legitimate studies that revealed its dangers. Monsanto led a prolonged campaign of misinformation to convince government agencies, farmers and the general population that Roundup® was safe.

### The Discovery of Glyphosate and Development of Roundup®

77.     The herbicidal properties of glyphosate were discovered in 1970 by Monsanto chemist John Franz. The first glyphosate-based herbicide was introduced to the market in the mid-1970s under the brand name Roundup®. From the outset, Monsanto marketed Roundup® as a "safe" general-purpose herbicide for widespread commercial and consumer use; Osborn & Barr joined or took over these misleading marketing efforts in the early 1990s and continued through 2012 . Monsanto still markets Roundup® as safe today.

### Registration of Herbicides under Federal Law

78.     The manufacture, formulation and distribution of herbicides, such as Roundup®, are regulated under the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA" or "Act"), 7 U.S.C. § 136 *et seq.* FIFRA requires that all pesticides be registered with the Environmental Protection Agency ("EPA" or "Agency") prior to their distribution, sale, or use, except as described by the Act. 7 U.S.C. § 136a(a).

79.     Because pesticides are toxic to plants, animals, and humans, at least to some degree, the EPA requires as part of the registration process, among other things, a variety of tests to evaluate the potential for exposure to pesticides, toxicity to people and other potential non-target organisms, and other adverse effects on the environment. Registration by the EPA, however, is not an assurance or finding of safety. The determination the Agency must make in

Electronically Filed - City of St. Louis - March 14, 2017 - 10:45 AM

registering or re-registering a product is not that the product is "safe," but rather that use of the product in accordance with its label directions "will not generally cause unreasonable adverse effects on the environment." 7 U.S.C. § 136a(c)(5)(D).

80.     FIFRA defines "unreasonable adverse effects on the environment" to mean "any unreasonable risk to man or the environment, taking into account the economic, social, and environmental costs and benefits of the use of any pesticide." 7 U.S.C. § 136(bb). FIFRA thus requires EPA to make a risk/benefit analysis in determining whether a registration should be granted or allowed to continue to be sold in commerce.

81.     The EPA registered Roundup® for distribution, sale, and manufacture in the United States and the States of Missouri.

82.     FIFRA generally requires that the registrant, Monsanto in the case of Roundup®, conducts the health and safety testing of pesticide products. The EPA has protocols governing the conduct of tests required for registration and the laboratory practices that must be followed in conducting these tests. The data produced by the registrant must be submitted to the EPA for review and evaluation. The government is not required, nor is it able, however, to perform the product tests that are required of the manufacturer.

83.     The evaluation of each pesticide product distributed, sold, or manufactured is completed at the time the product is initially registered. The data necessary for registration of a pesticide has changed over time. The EPA is now in the process of re-evaluating all pesticide products through a Congressionally-mandated process called "re-registration." 7 U.S.C. § 136a-1.  In order to reevaluate these pesticides, the EPA is demanding the completion of additional tests and the submission of data for the EPA's review and evaluation.

Electronically Filed - City of St. Louis - March 14, 2017 - 10:45 AM

84.     In the case of glyphosate, and therefore Roundup®, the EPA had planned on releasing its preliminary risk assessment —in relation to the re-registration process—no later than July 2015. The EPA completed its review of glyphosate in early 2015, but it delayed releasing the risk assessment pending further review in light of the WHO's health-related findings.

### *Scientific Fraud Underlying the Marketing and Sale of Glyphosate/Roundup*

85.     Based on early studies that glyphosate could cause cancer in laboratory animals, the EPA originally classified glyphosate as *possibly carcinogenic to humans* (Group C) in 1985. After pressure from Monsanto, including contrary studies it provided to the EPA, the EPA changed its classification to *evidence of non-carcinogenicity in humans* (Group E) in 1991. In so classifying glyphosate, however, the EPA made clear that the designation did not mean the chemical does not cause cancer: "It should be emphasized, however, that designation of an agent in Group E is based on the available evidence at the time of evaluation and should not be interpreted as a definitive conclusion that the agent will not be a carcinogen under any circumstances."

86.     On two occasions, the EPA found that the laboratories hired by Monsanto to test the toxicity of its Roundup® products for registration purposes committed fraud.

87.     In the first instance, Monsanto, in seeking initial registration of Roundup® by EPA, hired Industrial Bio-Test Laboratories ("IBT") to perform and evaluate pesticide toxicology studies relating to Roundup®. IBT performed about 30 tests on glyphosate and glyphosate-containing products, including nine of the 15 residue studies needed to register Roundup®.

Electronically Filed - City of St. Louis - March 14, 2017 - 10:45 AM

88.     In 1976, the United States Food and Drug Administration ("FDA") performed an inspection of Industrial Bio-Test Industries ("IBT") that revealed discrepancies between the raw data and the final report relating to the toxicological impacts of glyphosate. The EPA subsequently audited IBT; it too found the toxicology studies conducted for the Roundup® herbicide to be invalid. An EPA reviewer stated, after finding "routine falsification of data" at IBT, that it was "hard to believe the scientific integrity of the studies when they said they took specimens of the uterus from male rabbits."

89.     Three top executives of IBT were convicted of fraud in 1983.

90.     In the second incident of data falsification, Monsanto hired Craven Laboratories in 1991 to perform pesticide and herbicide studies, including for Roundup®. In that same year, the owner of Craven Laboratories and three of its employees were indicted, and later convicted, of fraudulent laboratory practices in the testing of pesticides and herbicides.

91.     Despite the falsity of the tests that underlie its registration, within a few years of its launch, Monsanto was marketing Roundup® in 115 countries.

92.     Osborn & Barr was responsible for much of the marketing of Roundup between 1990 and 2012, including targeted marketing to farmers; these efforts touted Roundup's efficacy and safety, never once disclosing the EPA classification mentioned above or the fraud involved in safety testing. Osborn & Barr also helped to design the packaging for Roundup products, which never warned of the cancer risk.

93.     Osborn & Barr intensively marketed Roundup to the general public as made by a company that "puts the farmer first."  The marketing efforts were so successful that the agricultural community embraced Monsanto ever more warmly, with the U.S. Secretary of Agriculture going so far as to thank Monsanto for what it does for farmers.

Electronically Filed - City of St. Louis - March 14, 2017 - 10:45 AM

94.     Ironically, Osborn & Barr spearheaded efforts to portray Monsanto as an anti-cancer crusader in its farmer-friendly marketing, remaining absolutely silent as to the fact that Monsanto's biggest seller triples users' risk of non-Hodgkin lymphoma.

95.     Monsanto has acknowledged that Monsanto and its sales of agricultural products including Roundup "wouldn't be the same" without Osborn & Barr.

96.     Osborn & Barr even developed and maintains a public marketing website to advance Monsanto's sales called "Growing Safely:  Focused on Safety in Agriculture" with numerous different subsections, failing to mention to consumers and potential consumers that Roundup is closely associated with cancer, nor recommending any safety precautions for the application of Roundup.  Instead, viewers are distracted by such sections as "ATV safety." Osborn & Barr also marketed and disseminated information on behalf of American Farmers for the Advancement and Conservation of Technology, a Monsanto-backed group created to convince the public that genetically-modified crops, created by Monsanto and sold as "Roundup Ready," were safe and that anti-GMO activists were cranks.

97.     Multiple studies have been ghostwritten in part and/or published by Monsanto through companies such as Intertek and Exponent, Inc. from 2000-present which minimize any safety concerns about the use of glyphosate; are used to convince regulators to allow the sale of Roundup, and are used to convince customers to use Roundup.  Such studies include, but are not limited to Williams (2000); Williams (2012); Kier & Kirkland (2013); Kier (2015); Bus (2016); Chang (2016); and the Intertek Expert Panel Manuscripts.  All of these studies have been submitted to and relied upon the public and the EPA in assessing the safety of glyphosate. Through these means Monsanto has fraudulently represented that independent scientists have concluded that Glyphosate is safe.  In fact, these independent experts have been paid by

Electronically Filed - City of St. Louis - March 14, 2017 - 10:45 AM

Monsanto and have failed to disclose the significant role Monsanto had in creating the manuscripts.  Monsanto has further ghostwritten editorials for scientists such as Robert Tarone and Henry Miller to advocate for the safety of glyphosate in Newspapers and Magazines. Monsanto has also ghostwritten letters by supposed independent scientists submitted to regulatory agencies who are reviewing the safety of glyphosate.

98.     Monsanto has also violated federal regulations in holding secret ex parte meetings and conversations with certain EPA employees to collude in a strategy to re-register glyphosate and to quash investigations into the carcinogenicity of glyphosate by other federal agencies such as the Agency for Toxic Substances and Disease Registry.  Monsanto's close connection with the EPA arises in part from its offering of lucrative consulting gigs to retiring EPA officials.

99.     In March 2015, The Joint Glyphosate Task Force at Monsanto's behest issued a press release sharply criticizing IARC, stating that IARC's conclusion was "baffling" and falsely claiming that "IARC did not consider any new or unique research findings when making its decision. It appears that only by deciding to exclude certain available scientific information and by adopting a different approach to interpreting the studies was this possible."

100.     Beginning in 2011, the Federal Institute for Risk Assessment (BfR) in Germany began preparing a study on the safety of glyphosate. Through the Glyphosate Task Force, Defendants were able to co-opt this study becoming the sole providers of data and ultimately wrote the report which was rubber-stamped by the BfR.  The Glyphosate Task Force was solely responsible for preparing and submitting summary of studies relied upon by the by the BfR. Defendants have used this report, which they wrote, to falsely proclaim the safety of glyphosate.

101.     In October 2015, the Defendants as members of the Joint Glyphosate Task Force wrote to the state of California to try to stop California from warning the public about the

Electronically Filed - City of St. Louis - March 14, 2017 - 10:45 AM

carcinogenicity of glyphosate arguing that the IARC classification is mistaken.   In January of 2016 Monsanto filed a lawsuit to stop California from warning the public about the carcinogenicity of glyphosate.

### The Importance of Roundup® to Monsanto's Market Dominance Profits

102.      The success of Roundup® was key to Monsanto's continued reputation and dominance in the marketplace.  Largely due to the success of Roundup® sales, Monsanto's agriculture division was out-performing its chemicals division's operating income, and that gap increased yearly. But with its patent for glyphosate expiring in the United States in the year 2000, Monsanto needed a strategy to maintain its Roundup® market dominance and to ward off impending competition.

103.      In response, Monsanto began the development and sale of genetically engineered Roundup Ready® seeds in 1996. Since Roundup Ready® crops are resistant to glyphosate; farmers can spray Roundup® onto their fields during the growing season without harming the crop. This allowed Monsanto to expand its market for Roundup® even further; by 2000, Monsanto's biotechnology seeds were planted on more than 80 million acres worldwide and nearly 70% of American soybeans were planted from Roundup Ready® seeds. It also secured Monsanto's dominant share of the glyphosate/Roundup® market through a marketing strategy that coupled proprietary Roundup Ready® seeds with continued sales of its Roundup® herbicide.

104.      Through a three-pronged strategy of increased production, decreased prices and by coupling with Roundup Ready® seeds, Roundup® became Monsanto's most profitable product. In 2000, Roundup® accounted for almost $2.8 billion in sales, outselling other

Electronically Filed - City of St. Louis - March 14, 2017 - 10:45 AM

herbicides by a margin of five to one, and accounting for close to half of Monsanto's revenue. Today, glyphosate remains one of the world's largest herbicides by sales volume.

*Monsanto has known for decades that it falsely advertises the safety of Roundup®. Osborn & Barr, founded by a former Monsanto executive and intimately familiar with Monsanto's safety and PR challenges, has also known for decades that it falsely advertises the safety of Roundup®.*

105.    In 1996, the New York Attorney General ("NYAG") filed a lawsuit against Monsanto based on its false and misleading advertising of Roundup ® products. Specifically, the lawsuit challenged Monsanto's general representations that its spray-on glyphosate-based herbicides, including Roundup®, were "**safer than table salt**" and "**practically non-toxic**" to mammals, birds, and fish. Among the representations the NYAG found deceptive and misleading about the human and environmental safety of Roundup® are the following:

a)    Remember that environmentally friendly Roundup herbicide is biodegradable.  It won't build up in the soil so you can use Roundup with confidence along customers' driveways, sidewalks and fences ...

b)    And remember that Roundup is biodegradable and won't build up in the soil. That will give you the environmental confidence you need to use Roundup everywhere you've got a weed, brush, edging or trimming problem.

c)    Roundup biodegrades into naturally occurring elements.

d)    Remember that versatile Roundup herbicide stays where you put it. That means there's no washing or leaching to harm customers' shrubs or other desirable vegetation.

Electronically Filed - City of St. Louis - March 14, 2017 - 10:45 AM

e)      This non-residual herbicide will not wash or leach in the soil. It ... stays where you apply it.

f)      You can apply Accord with "confidence because it will stay where you put it" it bonds tightly to soil particles, preventing leaching. Then, soon after application, soil microorganisms biodegrade Accord into natural products.

g)      Glyphosate is less toxic to rats than table salt following acute oral ingestion.

h)      Glyphosate's safety margin is much greater than required. It has over a 1,000-fold safety margin in food and over a 700-fold safety margin for workers who manufacture it or use it.

i)      You can feel good about using herbicides by Monsanto. They carry a toxicity category rating of 'practically non-toxic' as it pertains to mammals, birds and fish.

j)      "Roundup can be used where kids and pets will play and breaks down into natural material." This ad depicts a person with his head in the ground and a pet dog standing in an area which has been treated with Roundup.

106.    November 19, 1996, Monsanto entered into an Assurance of Discontinuance with NYAG, in which Monsanto agreed, among other things, "to cease and desist from publishing or broadcasting any advertisements [in New York] that represent, directly or by implication" that:

a)      its glyphosate-containing pesticide products or any component thereof are safe, non-toxic, harmless or free from risk. * * *

Electronically Filed - City of St. Louis - March 14, 2017 - 10:45 AM

b)      its glyphosate-containing pesticide products or any component thereof manufactured, formulated, distributed or sold by Monsanto are biodegradable * * *

c)      its glyphosate-containing pesticide products or any component thereof stay where they are applied under all circumstances and will not move through the environment by any means.

* * *

d)      its glyphosate-containing pesticide products or any component thereof are "good" for the environment or are "known for their environmental characteristics." * * *

e)      glyphosate-containing pesticide products or any component thereof are safer or less toxic than common consumer products other than herbicides;

f)      its glyphosate-containing products or any component thereof might be classified as "practically non-toxic.

107.    Monsanto did not alter its advertising in the same manner in any state other than New York, and on information and belief still has not done so today.

108.    In 2009, France's highest court ruled that Monsanto had not told the truth about the safety of Roundup®. The French court affirmed an earlier judgement that Monsanto had falsely advertised its herbicide Roundup® as "biodegradable" and that it "left the soil clean."

### Classifications and Assessments of Glyphosate

109.    The IARC process for the classification of glyphosate followed the stringent procedures for the evaluation of a chemical agent. Over time, the IARC Monograph program has reviewed 980 agents. Of those reviewed, it has determined 116 agents to be Group 1 (Known

Human Carcinogens); 73 agents to be Group 2A (Probable Human Carcinogens); 287 agents to

be Group 2B (Possible Human Carcinogens); 503 agents to be Group 3 (Not Classified); and one

agent to be Probably Not Carcinogenic.

110.    The established procedure for IARC Monograph evaluations is described in the

IARC Programme's Preamble.  Evaluations are performed by panels of international experts,

selected on the basis of their expertise and the absence of actual or apparent conflicts of interest.

111.    One year before the Monograph meeting, the meeting is announced and there is a

call both for data and for experts. Eight months before the Monograph meeting, the Working

Group membership is selected and the sections of the Monograph are developed by the Working

Group members. One month prior to the Monograph meeting, the call for data is closed and the

various draft sections are distributed among Working Group members for review and comment.

Finally, at the Monograph meeting, the Working Group finalizes review of all literature,

evaluates the evidence in each category, and completes the overall evaluation. Within two weeks

after the Monograph meeting, the summary of the Working Group findings are published in

Lancet Oncology, and within a year after the meeting, the final Monograph is finalized and

published.

112.    In assessing an agent, the IARC Working Group reviews the following

information:

(a)    human, experimental, and mechanistic data;

(b)    all pertinent epidemiological studies and cancer bioassays; and

(c)    representative mechanistic data. The studies must be publicly available

and have sufficient detail for meaningful review, and reviewers cannot be

associated with the underlying study.

Electronically Filed - City of St. Louis - March 14, 2017 - 10:45 AM

113.    In March 2015, IARC reassessed glyphosate. The summary published in *The Lancet Oncology* reported that glyphosate is a Group 2A agent and probably carcinogenic in humans.

114.    On July 29, 2015, IARC issued its Monograph for glyphosate, Monograph 112. For Volume 112, the volume that assessed glyphosate, a Working Group of 17 experts from 11 countries met at IARC from March 3–10, 2015, to assess the carcinogenicity of certain herbicides, including glyphosate. The March meeting culminated nearly a one-year review and preparation by the IARC Secretariat and the Working Group, including a comprehensive review of the latest available scientific evidence. According to published procedures, the Working Group considered "reports that have been published or accepted for publication in the openly available scientific literature" as well as "data from governmental reports that are publicly available."

115.    The studies considered the following exposure groups: occupational exposure of farmers and tree nursery workers in the United States, forestry workers in Canada and Finland and municipal weed-control workers in the United Kingdom; and para-occupational exposure in farming families.

116.    Glyphosate was identified as the second-most used household herbicide in the United States for weed control between 2001 and 2007 and the most heavily used herbicide in the world in 2012[1].

117.    Exposure pathways are identified as air (especially during spraying), water, and food. Community exposure to glyphosate is widespread and found in soil, air, surface water, and groundwater, as well as in food.

---

[1] Roundup rose to the most-used herbicide in the world thanks in no small part to Osborn & Barr's marketing.

Electronically Filed - City of St. Louis - March 14, 2017 - 10:45 AM

118.     The assessment of the IARC Working Group identified several case control studies of occupational exposure in the United States, Canada, and Sweden. These studies show a human health concern from agricultural and other work-related exposure to glyphosate.

119.     The IARC Working Group found an increased risk between exposure to glyphosate and non-Hodgkin lymphoma ("NHL") and several subtypes of NHL, and the increased risk persisted after adjustment for other pesticides.

120.     The IARC Working Group also found that glyphosate caused DNA and chromosomal damage in human cells. One study in community residents reported increases in blood markers of chromosomal damage (micronuclei) after glyphosate formulations were sprayed.

121.     In male CD-1 mice, glyphosate induced a positive trend in the incidence of a rare tumor, renal tubule carcinoma. A second study reported a positive trend for haemangiosarcoma in male mice. Glyphosate increased pancreatic islet-cell adenoma in male rats in two studies. A glyphosate formulation promoted skin tumors in an initiation-promotion study in mice.

122.     The IARC Working Group also noted that glyphosate has been detected in the urine of agricultural workers, indicating absorption. Soil microbes degrade glyphosate to aminomethylphosphoric acid (AMPA). Blood AMPA detection after exposure suggests intestinal microbial metabolism in humans.

123.     The IARC Working Group further found that glyphosate and glyphosate formulations induced DNA and chromosomal damage in mammals, and in human and animal cells in utero.

124.     The IARC Working Group also noted genotoxic, hormonal, and enzymatic effects in mammals exposed to glyphosate. Essentially, glyphosate inhibits the biosynthesis of aromatic

Electronically Filed - City of St. Louis - March 14, 2017 - 10:45 AM

amino acids, which leads to several metabolic disturbances, including the inhibition of protein and secondary product biosynthesis and general metabolic disruption.

125.    The IARC Working Group also reviewed an Agricultural Health Study, consisting of a prospective cohort of 57,311 licensed pesticide applicators in Iowa and North Carolina. While this study differed from others in that it was based on a self-administered questionnaire, the results support an association between glyphosate exposure and Multiple Myeloma, Hairy Cell Leukemia (HCL), and Chronic Lymphocytic Leukemia (CLL), in addition to several other cancers.

### *Other Earlier Findings About Glyphosate's Dangers to Human Health*

126.    The EPA has a technical fact sheet, as part of its Drinking Water and Health, National Primary Drinking Water Regulations publication, relating to glyphosate. This technical fact sheet predates the IARC March 20, 2015, evaluation. The fact sheet describes the release patterns for glyphosate as follows:

**Release Patterns**

127.    Glyphosate is released to the environment in its use as a herbicide for controlling woody and herbaceous weeds on forestry, right-of-way, cropped and non-cropped sites. These sites may be around water and in wetlands. It may also be released to the environment during its manufacture, formulation, transport, storage, disposal and cleanup, and from spills. Since glyphosate is not a listed chemical in the Toxics Release Inventory, data on releases during its manufacture and handling are not available. Occupational workers and home gardeners may be exposed to glyphosate by inhalation and dermal contact during spraying, mixing, and cleanup. They may also be exposed by touching soil and plants to which glyphosate was applied.

Electronically Filed - City of St. Louis - March 14, 2017 - 10:45 AM

Occupational exposure may also occur during glyphosate's manufacture, transport storage, and disposal.

128.    In 1995, the Northwest Coalition for Alternatives to Pesticides reported that in California, the state with the most comprehensive program for reporting of pesticide-caused illness, glyphosate was the third most commonly-reported cause of pesticide illness among agricultural workers.

### Recent Worldwide Bans on Roundup®/Glyphosate

129.    Several countries around the world have instituted bans on the sale of Roundup® and other glyphosate-containing herbicides, both before and since IARC first announced its assessment for glyphosate in March 2015, and more countries undoubtedly will follow suit in light of the as the dangers of the use of Roundup® are more widely known. The Netherlands issued a ban on all glyphosate-based herbicides in April 2014, including Roundup®, which takes effect by the end of 2015. In issuing the ban, the Dutch Parliament member who introduced the successful legislation stated: "Agricultural pesticides in user-friendly packaging are sold in abundance to private persons. In garden centers, Roundup® is promoted as harmless, but unsuspecting customers have no idea what the risks of this product are. Especially children are sensitive to toxic substances and should therefore not be exposed to it."

130.    The Brazilian Public Prosecutor in the Federal District requested that the Brazilian Justice Department suspend the use of glyphosate.

131.    France banned the private sale of Roundup® and glyphosate following the IARC assessment for Glyphosate.

132.    Bermuda banned both the private and commercial sale of glyphosates, including Roundup®. The Bermuda government explained its ban as follows: "Following a recent

Electronically Filed - City of St. Louis - March 14, 2017 - 10:45 AM

scientific study carried out by a leading cancer agency, the importation of weed spray 'Roundup' has been suspended."

133.    The Sri Lankan government banned the private and commercial use of glyphosates, particularly out of concern that Glyphosate has been linked to fatal kidney disease in agricultural workers.

134.    The government of Columbia announced its ban on using Roundup® and glyphosate to destroy illegal plantations of coca, the raw ingredient for cocaine, because of the WHO's finding that glyphosate is probably carcinogenic.

## V.    CLAIMS

### COUNT I
### STRICT LIABILITY (DESIGN DEFECT)
(AGAINST MONSANTO)

135.    Plaintiffs incorporate by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

136.    Plaintiffs bring this strict liability claim against Monsanto for defective design.

137.    At all times relevant to this litigation, Monsanto engaged in the business of testing, developing, manufacturing, selling, distributing, and Monsanto a engaged in the marketing, packaging design, and promotion of Roundup® products, which are defective and unreasonably dangerous to consumers, including Plaintiff, thereby placing Roundup® products into the stream of commerce. These actions were under the ultimate control and supervision of Monsanto. At all times relevant to this litigation, Monsanto designed, researched, developed, manufactured, produced, tested, assembled, labeled, advertised, promoted, marketed, sold, and distributed the Roundup® products used by the Plaintiff, as described above.

Electronically Filed - City of St. Louis - March 14, 2017 - 10:45 AM

138.     At all times relevant to this litigation, Roundup® products were manufactured, designed, and labeled in an unsafe, defective, and inherently dangerous manner that was dangerous for use by or exposure to the public, and, in particular, the Plaintiff.

139.     At all times relevant to this litigation, Roundup® products reached the intended consumers, handlers, and users or other persons coming into contact with these products in Missouri and throughout the United States, including Plaintiff, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, and marketed by Monsanto.

140.     Roundup® products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold, and marketed by Monsanto were defective in design and formulation in that when they left the hands of the manufacturers and/or suppliers, they were unreasonably dangerous and dangerous to an extent beyond that which an ordinary consumer would contemplate.

141.     Roundup® products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold, and marketed by Monsanto were defective in design and formulation in that when they left the hands of the manufacturers and/or suppliers, the foreseeable risks exceeded the alleged benefits associated with their design and formulation.

142.     At all times relevant to this action, Monsanto knew or had reason to know that Roundup® products were defective and were inherently dangerous and unsafe when used in the manner instructed and provided by Monsanto.

143.     Therefore, at all times relevant to this litigation, Roundup® products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed,

Electronically Filed - City of St. Louis - March 14, 2017 - 10:45 AM

sold and marketed by Monsanto were defective in design and formulation, in one or more of the following ways:

(a)     When placed in the stream of commerce, Roundup® products were defective in design and formulation, and, consequently, dangerous to an extent beyond that which an ordinary consumer would contemplate.

(b)     When placed in the stream of commerce, Roundup® products were unreasonably dangerous in that they were hazardous and posed a grave risk of cancer and other serious illnesses when used in a reasonably anticipated manner.

(c)     When placed in the stream of commerce, Roundup® products contained unreasonably dangerous design defects and were not reasonably safe when used in a reasonably anticipated or intended manner.

(d)     Monsanto did not sufficiently test, investigate, or study Roundup® products and, specifically, the active ingredient glyphosate.

(e)     Exposure to Roundup® and glyphosate-containing products presents a risk of harmful side effects that outweigh any potential utility stemming from the use of the herbicide.

(f)     At the time of marketing its Roundup® products, Roundup® was defective in that exposure to Roundup® and specifically, its active ingredient glyphosate, could result in cancer and other severe illnesses and injuries.

(g)     Monsanto did not conduct adequate post-marketing surveillance of its Roundup® products.

(h)     Monsanto could have employed safer alternative designs and formulations.

Electronically Filed - City of St. Louis - March 14, 2017 - 10:45 AM

144.     Plaintiffs were exposed to Roundup® products in the course of their work, as described above, without knowledge of their dangerous characteristics.

145.     At all times relevant to this litigation, Plaintiffs used and/or were exposed to the use of Roundup® products in an intended or reasonably foreseeable manner without knowledge of their dangerous characteristics.

146.     Plaintiff could not have reasonably discovered the defects and risks associated with Roundup® or glyphosate-containing products before or at the time of exposure.

147.     The harm caused by Roundup® products far outweighed their benefit, rendering these products dangerous to an extent beyond that which an ordinary consumer would contemplate. Roundup® products were and are more dangerous than alternative products and Monsanto could have designed Roundup® products (including their packaging and sales aids) to make them less dangerous. Indeed, at the time that Monsanto designed Roundup® products, the state of the industry's scientific knowledge was such that a less risky design or formulation was attainable.

148.     At the time Roundup® products left Monsanto's control, there was a practical, technically feasible and safer alternative design that would have prevented the harm without substantially impairing the reasonably anticipated or intended function of those herbicides.

149.     Monsanto's defective design of Roundup® products was willful, wanton, fraudulent, malicious, and conducted with reckless disregard for the health and safety of users of the Roundup® products, including the Plaintiffs herein.

150.     Therefore, as a result of the unreasonably dangerous condition of its Roundup® products, Monsanto is strictly liable to Plaintiffs.

Electronically Filed - City of St. Louis - March 14, 2017 - 10:45 AM

151.    The defects in Roundup® products caused or contributed to cause Plaintiffs' grave injuries, and, but for Monsanto's misconduct and omissions, Plaintiffs would not have sustained their injuries.

152.    Monsanto's conduct, as described above, was reckless. Monsanto risked the lives of consumers and users of its products, including Plaintiffs, with knowledge of the safety problems associated with Roundup® and glyphosate-containing products, and suppressed this knowledge from the general public. Monsanto made conscious decisions not to redesign, warn or inform the unsuspecting public. Monsanto's reckless conduct warrants an award of aggravated damages.

153.    As a direct and proximate result of Monsanto placing defective Roundup® products into the stream of commerce, Plaintiffs have suffered and continue to suffer grave injuries, and have endured physical pain and discomfort, as well as economic hardship, including considerable financial expenses for medical care, and treatment.

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in Plaintiffs' favor for compensatory and punitive damages in an amount in excess of Twenty Five Thousand Dollars ($25,000.00), together with interest, costs herein incurred, and all such other and further relief as this Court deems just and proper. Plaintiffs also demand a jury trial on the issues contained herein.

**COUNT II**
**STRICT LIABILITY (FAILURE TO WARN)**
(AGAINST MONSANTO)

154.    Plaintiffs incorporate by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

155.    Plaintiffs bring this strict liability claim against Monsanto for failure to warn.

Electronically Filed - City of St. Louis - March 14, 2017 - 10:45 AM

156.     At all times relevant to this litigation, Monsanto engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup® products, , which are defective and unreasonably dangerous to consumers, including Plaintiffs, because they do not contain adequate warnings or instructions concerning the dangerous characteristics of Roundup® and specifically, the active ingredient glyphosate. These actions were under the ultimate control and supervision of Monsanto.

157.     Monsanto researched, developed, designed, tested, manufactured, inspected, labeled, distributed, marketed, promoted, sold, and otherwise released into the stream of commerce Roundup® products, and in the course of same, directly advertised or marketed the products to consumers and end users, including the Plaintiffs, and therefore had a duty to warn of the risks associated with the use of Roundup® and glyphosate-containing products.

158.     At all times relevant to this litigation, Monsanto had a duty to properly test, develop, design, manufacture, inspect, package, label, market, promote, sell, distribute, maintain supply, provide proper warnings, and take such steps as  necessary to ensure that Roundup® products did not cause users and consumers to suffer from unreasonable and dangerous risks. Monsanto had a continuing duty to warn the Plaintiffs of the dangers associated with Roundup® use and exposure. Monsanto, as manufacturer, seller, promoter, marketer, or distributor of chemical herbicides are held to the knowledge of an expert in the field.

159.     At the time of manufacture, Monsanto could have provided the warnings or instructions regarding the full and complete risks of Roundup® and glyphosate-containing products because they knew or should have known of the unreasonable risks of harm associated with the use of and/or exposure to such products.

Electronically Filed - City of St. Louis - March 14, 2017 - 10:45 AM

160.    At all times relevant to this litigation, Monsanto failed to investigate, study, test, or promote the safety or to minimize the dangers to users and consumers of its product and to those who would foreseeably use or be harmed by these herbicides, including Plaintiffs.

161.    Despite the fact that Monsanto knew or should have known that Roundup® posed a grave risk of harm, it failed to exercise reasonable care to warn of the dangerous risks associated with use and exposure. The dangerous propensities of these products and the carcinogenic characteristics of glyphosate, as described above, were known to Monsanto, or scientifically knowable to Monsanto through appropriate research and testing by known methods, at the time they distributed, marketed, promoted, supplied or sold the product, and not known to end users and consumers, such as Plaintiffs.

162.    These products created significant risks of serious bodily harm to consumers, as alleged herein, and Monsanto failed to adequately warn consumers and reasonably foreseeable users of the risks of exposure to its products. Monsanto has wrongfully concealed information concerning the dangerous nature of Roundup® and its active ingredient glyphosate, and further made false and/or misleading statements concerning the safety of Roundup® and glyphosate.

163.    At all times relevant to this litigation, Roundup® products reached the intended consumers, handlers, and users or other persons coming into contact with these products in Missouri and throughout the United States, including Plaintiffs, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, promoted and marketed by Monsanto.

164.    Plaintiffs were exposed to  Roundup® products in the course of their personal use on his garden and lawn, without knowledge of their dangerous characteristics.

Electronically Filed - City of St. Louis - March 14, 2017 - 10:45 AM

165.    At all times relevant to this litigation, Plaintiffs used and/or were exposed to the use of Roundup® products in their intended or reasonably foreseeable manner without knowledge of their dangerous characteristics.

166.    Plaintiffs could not have reasonably discovered the defects and risks associated with Roundup® or glyphosate-containing products prior to or at the time of Plaintiffs' exposure. Plaintiffs relied upon the skill, superior knowledge, and judgment of Monsanto.

167.    These product were defective because  the minimal warnings disseminated with Roundup® products were inadequate, and they failed to communicate adequate information on the dangers and safe use/exposure and failed to communicate warnings and instructions that were appropriate and adequate to render the products safe for their ordinary, intended and reasonably foreseeable uses, including agricultural and landscaping applications.

168.    The information that Monsanto did provide or communicate failed to contain relevant warnings, hazards, and precautions that would have enabled consumers such as Plaintiffs to utilize the products safely and with adequate protection. Instead, Monsanto disseminated information that was inaccurate, false, and misleading and which failed to communicate accurately or adequately the comparative severity, duration, and extent of the risk of injuries with use of and/or exposure to Roundup® and glyphosate; continued to aggressively promote the efficacy of its products, even after it knew or should have known of the unreasonable risks from use or exposure; and concealed, downplayed, or otherwise suppressed, through aggressive marketing and promotion, any information or research about the risks and dangers of exposure to Roundup® and glyphosate.

Electronically Filed - City of St. Louis - March 14, 2017 - 10:45 AM

169.    To this day, Monsanto has failed to adequately and accurately warn of the true risks of Plaintiffs' injuries associated with the use of and exposure to Roundup® and its active ingredient glyphosate, a probable carcinogen.

170.    As a result of their inadequate warnings, Roundup® products were defective and unreasonably dangerous when they left the possession and/or control of Monsanto, were distributed, marketed, and promoted by Monsanto, and used by Plaintiffs in their work.

171.    Monsanto is liable to Plaintiff for injuries caused by their negligent or willful failure, as described above, to provide adequate warnings or other clinically relevant information and data regarding the appropriate use of these products and the risks associated with the use of or exposure to Roundup® and glyphosate.

172.    The defects in Roundup® products caused or contributed to cause Plaintiffs' injuries, and, but for this misconduct and omissions, Plaintiffs would not have sustained their injuries.

173.    Had Monsanto provided adequate warnings and instructions and properly disclosed and disseminated the risks associated with Roundup® products, Plaintiffs could have avoided the risk of developing injuries as alleged herein.

174.    As a direct and proximate result of Monsanto placing defective Roundup® products into the stream of commerce, Plaintiffs have suffered severe injuries and have endured physical pain and discomfort, as well as economic hardship, including considerable financial expenses for medical care and treatment.

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in Plaintiff's favor for compensatory and punitive damages in an amount in excess of Twenty Five Thousand Dollars ($25,000.00) together with interest, costs herein incurred, and all such other and further

Electronically Filed - City of St. Louis - March 14, 2017 - 10:45 AM

relief as  this Court deems just and proper. Plaintiffs also demand a jury trial on the issues contained herein.

## COUNT III

## NEGLIGENCE
(AGAINST MONSANTO)

175.    Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

176.    Monsanto, directly or indirectly, caused Roundup® products to be sold, distributed, packaged, labeled, marketed, promoted, and/or used by Plaintiffs.

177.    At all times relevant to this litigation, Monsanto had a duty to exercise reasonable care in the design, research, manufacture, marketing, advertisement, supply, promotion, packaging, sale, and distribution of Roundup® products, including the duty to take all reasonable steps necessary to manufacture, promote, and/or sell a product that was not unreasonably dangerous to consumers and users of the product.

178.    At all times relevant to this litigation, Monsanto s had a duty to exercise reasonable care in the marketing, advertisement, and sale of the Roundup® products. Monsanto's duty of care owed to consumers and the general public included providing accurate, true, and correct information concerning the risks of using Roundup® and appropriate, complete, and accurate warnings concerning the potential adverse effects of exposure to Roundup®, and, in particular, its active ingredient glyphosate.

179.    At all times relevant to this litigation, Monsanto knew or, in the exercise of reasonable care, should have known of the hazards and dangers of Roundup® and specifically, the carcinogenic properties of the chemical glyphosate.

Electronically Filed - City of St. Louis - March 14, 2017 - 10:45 AM

180.    Accordingly, at all times relevant to this litigation, Monsanto knew or, in the exercise of reasonable care, should have known that use of or exposure to its Roundup® products could cause or be associated with Plaintiffs' injuries and thus created a dangerous and unreasonable risk of injury to the users of these products, including Plaintiffs.

181.    Monsanto also knew or, in the exercise of reasonable care, should have known that users and consumers of Roundup® were unaware of the risks and the magnitude of the risks associated with use of and/or exposure to Roundup® and glyphosate-containing products.

182.    As such, Monsanto breached the duty of reasonable care and failed to exercise ordinary care in the design, research, development, manufacture, testing, marketing, supply, promotion, advertisement, packaging, sale, and distribution of its Roundup® products, in that Monsanto manufactured, marketed, promoted, and sold defective herbicides containing the chemical glyphosate, knew or had reason to know of the defects inherent in these products, knew or had reason to know that a user's or consumer's exposure to the products created a significant risk of harm and unreasonably dangerous side effects, and failed to prevent or adequately warn of these risks and injuries.

183.    Despite an ability and means to investigate, study, and test these products and to provide adequate warnings, Monsanto  has failed to do so. Indeed, Monsanto  haswrongfully concealed information and have further made false and/or misleading statements concerning the safety and/or exposure to Roundup® and glyphosate.

184.    Monsanto was negligent in the following respects:

(a)    Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing its Roundup® products without thorough and adequate pre- and post-market testing;

Electronically Filed - City of St. Louis - March 14, 2017 - 10:45 AM

(b)     Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing Roundup® while negligently and/or intentionally concealing and failing to disclose the results of trials, tests, and studies of exposure to glyphosate, and, consequently, the risk of serious harm associated with human use of and exposure to Roundup®;

(c)     Failing to undertake sufficient studies and conduct necessary tests to determine whether or not Roundup® products and glyphosate-containing products were safe for their intended use in agriculture and horticulture;

(d)     Failing to use reasonable and prudent care in the design, research, manufacture, and development of Roundup® products so as to avoid the risk of serious harm associated with the prevalent use of Roundup®/glyphosate as an herbicide;

(e)     Failing to design and manufacture Roundup® products so as to ensure they were at least as safe and effective as other herbicides on the market;

(f)     Failing to provide adequate instructions, guidelines, and safety precautions to those persons who Monsanto could reasonably foresee would use and be exposed to its Roundup® products;

(g)     Failing to disclose to Plaintiffs, users/consumers, and the general public that use of and exposure to Roundup® presented severe risks of cancer and other grave illnesses;

(h)     Failing to warn Plaintiffs, consumers, and the general public that the product's risk of harm was unreasonable and that there were safer and effective alternative herbicides available to Plaintiff and other consumers;

Electronically Filed - City of St. Louis - March 14, 2017 - 10:45 AM

(i)      Systematically suppressing or downplaying contrary evidence about the risks, incidence, and prevalence of the side effects of Roundup® and glyphosate-containing products;

(j)      Representing that its Roundup® products were safe for their intended use when, in fact,   Monsanto knew or should have known that the products were not safe for their intended purpose;

(k)      Declining to make or propose any changes to Roundup® products' labeling or other promotional materials that would alert the consumers and the general public of the risks of Roundup® and glyphosate;

(l)      Advertising, marketing, and recommending the use of the Roundup® products, while concealing and failing to disclose or warn of the dangers known by Monsanto to be associated with or caused by the use of or exposure to Roundup® and glyphosate;

(m)      Continuing to disseminate information to its consumers, which indicate or imply that Monsanto's Roundup® products are not unsafe for use in the agricultural and horticultural industries; and

(n)      Continuing the manufacture and sale of its products with the knowledge that the products were unreasonably unsafe and dangerous.

185.    Monsanto knew and/or should have known that it was foreseeable that consumers such as Plaintiff would suffer injuries as a result of Monsanto's failure to exercise ordinary care in the manufacturing, marketing, promotion, labeling, distribution, and sale of Roundup®.

186.    Plaintiffs did not know the nature and extent of the injuries that could result from the intended use of and/or exposure to Roundup® or its active ingredient glyphosate.

Electronically Filed - City of St. Louis - March 14, 2017 - 10:45 AM

187.    Monsanto's negligence was the proximate cause of the injuries, harm, and economic losses that Plaintiffs suffered, as described herein.

188.    Monsanto's conduct, as described above, was reckless. Monsanto regularly risked the lives of consumers and users of their products, including Plaintiffs, with full knowledge of the dangers of these products. Monsanto has made conscious decisions not to redesign, re-label, warn, or inform the unsuspecting public, including Plaintiffs. Monsanto's reckless conduct therefore warrants an award of aggravated or punitive damages.

189.    As a proximate result of Monsanto's wrongful acts and omissions in placing defective Roundup® products into the stream of commerce without adequate warnings of the hazardous and carcinogenic nature of glyphosate, Plaintiffs have suffered severe and permanent physical and emotional injuries.  Plaintiffs have endured pain and suffering, has suffered economic losses (including significant expenses for medical care and treatment) in an amount to be determined.

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in Plaintiff's favor for compensatory and punitive damages in an amount in excess of Twenty Five Thousand Dollars ($25,000.00) together with interest, costs herein incurred, and all such other and further relief as this Court deems just and proper. Plaintiffs also demand a jury trial on the issues contained herein.

## COUNT IV

### FRAUD, MISREPRESENTATION, AND SUPPRESION
### (AGAINST ALL DEFENDANTS)

190.    Plaintiffs incorporate by reference all of the above paragraphs as if set forth in full herein, particularly Paragraphs 99-122 which detail fraud with specificity.

Electronically Filed - City of St. Louis - March 14, 2017 - 10:45 AM

191.     Defendants fraudulently, intentionally, and/or negligently misrepresented to the public, and to the Plaintiffs, both directly and by and through the media, the scientific literature and purported "community outreach" programs, the safety of Roundup products, and/or fraudulently, intentionally, and/or negligently concealed, suppressed, or omitted material, adverse information regarding the safety of Roundup.

192.     The intentional and/or negligent misrepresentations and omissions of Defendants regarding the safety of Roundup products were communicated to Plaintiffs directly through ghostwritten articles, editorials, national and regional advertising, marketing and promotion efforts, as well as the packaging and sales aids.  The safety of Roundup products was also intentionally and/or negligently misrepresented to Plaintiffs and the public with the intent that such misrepresentations would cause Plaintiffs and other potential consumers to purchase and use or continue to purchase and use Roundup products.

193.     Defendants either knew or should have known of the material representations they were making regarding the safety and relative utility of Roundup products.

194.     Defendants fraudulently, intentionally, and/or negligently made the misrepresentations and/or actively concealed, suppressed, or omitted this material information with the specific desire to induce Plaintiffs, and the consuming public to purchase and use Roundup products. Defendants fraudulently, intentionally, and/or negligently, knew or should have known that Plaintiffs and the consuming public would rely on such material misrepresentations and/or omissions in selecting and applying Roundup products.  Defendants knew or should have known that Plaintiffs would rely on their false representations and omissions.

Electronically Filed - City of St. Louis - March 14, 2017 - 10:45 AM

195.     Defendants made these misrepresentations and actively concealed adverse information including the risk of non-Hodgkin lymphoma, at a time when, their agents and/or employees knew or should have known, the product had defects, dangers, and characteristics that were other than what was represented to the consuming public.  Specifically, Osborn & Barr misrepresented and actively concealed, suppressed, and omitted that there had been inadequate testing of the safety and efficacy of Roundup, and that prior studies, research, reports, and/or testing had been conducted linking the use of the drug with serious health events, including non-Hodgkin lymphoma.

196.     Despite the fact that Defendants knew or should have known of reports of severe risks including non-Hodgkin lymphoma, with Roundup use and exposure, this information was strategically minimized, understated, or omitted in order to create the impression that the human dangers of Roundup were nonexistent, particularly in light of its purported utility.

197.     The fraudulent, intentional and/or negligent material misrepresentations and/or active concealment, suppression, and omissions by Defendants were perpetuated directly and/or indirectly through the advertisements, packaging, sales aids, furtive public relations efforts, and other marketing and promotional pieces authored, analyzed, created, compiled, designed, drafted, disseminated, distributed, edited, evaluated, marketed, published, and supplied by Osborn & Barr.

198.     If Plaintiffs had known the true facts concerning the risks associated with Roundup exposure, Plaintiffs would have used a safer alternative.

199.     Plaintiffs reliance upon the material misrepresentations and omissions was justified, among other reasons, because said misrepresentations and omissions were made by individuals and entities who were in a position to know the true facts concerning Roundup while Plaintiffs were not in a position to know the true facts because Defendants overstated the benefits

Electronically Filed - City of St. Louis - March 14, 2017 - 10:45 AM

and safety of Roundup and downplayed the risk of lymphoma, thereby inducing Plaintiffs to use the herbicide rather than safer alternatives.

200.    As a direct and proximate result of Defendants' actions and inactions, Plaintiffs were exposed to Roundup and suffered and will continue to suffer injuries and damages, as set forth herein.

WHEREFORE, Plaintiffs demand judgment for compensatory, treble, and punitive damages, together with interest, costs of suit, attorneys' fees, in an amount greater than Twenty-Five Thousand Dollars ($25,000.00), and all such other relief as the Court deems proper.

## COUNT V

## VIOLATION OF THE CONSUMER FRAUD ACTS

201.    Plaintiffs incorporate by reference all of the above paragraphs as if set forth in full herein, particularly paragraphs 99-122 which allege fraud with specificity.

202.    Defendants fraudulently, intentionally, negligently, and/or innocently misrepresented to the public, and to the Plaintiffs, both directly and by and through the media and purported "community outreach" programs, the safety of Roundup products, and/or fraudulently, intentionally, negligently and/or innocently concealed, suppressed, or omitted material, adverse information regarding the safety of Roundup.  This deception caused injury to Plaintiff in violation of the Consumer Fraud Act of the Plaintiffs' home states which create private rights of action by the Plaintiffs.

203.    The intentional, negligent, and/or innocent misrepresentations and omissions of Defendants regarding the safety of Roundup products were communicated to Plaintiffs directly through national and regional advertising, marketing and promotion efforts, as well as the packaging and sales aids.  The safety of Roundup products was also intentionally, negligently,

Electronically Filed - City of St. Louis - March 14, 2017 - 10:45 AM

and/or innocently misrepresented to Plaintiffs and the public with the intent that such misrepresentations would cause Plaintiffs and other potential consumers to purchase and use or continue to purchase and use Roundup products.

204.     Defendants either knew or should have known of the material representations they were making regarding the safety and relative utility of Roundup products.

205.     Defendants fraudulently, intentionally, negligently, and/or innocently made the misrepresentations and/or actively concealed, suppressed, or omitted this material information with the specific desire to induce Plaintiffs, and the consuming public to purchase and use Roundup products. Defendants fraudulently, intentionally, negligently, and/or innocently, knew or should have known that Plaintiffs and the consuming public would rely on such material misrepresentations and/or omissions in selecting and applying Roundup products.  Defendants knew or should have known that Plaintiffs would rely on their false representations and omissions.

206.     Defendants made these misrepresentations and actively concealed adverse information including the risk of non-Hodgkin lymphoma, at a time when, their agents and/or employees knew or should have known, the product had defects, dangers, and characteristics that were other than what was represented to the consuming public.  Specifically, Defendants misrepresented and actively concealed, suppressed, and omitted that there had been inadequate testing of the safety and efficacy of Roundup, and that prior studies, research, reports, and/or testing had been conducted linking the use of the drug with serious health events, including non-Hodgkin lymphoma.

207.     Despite the fact that Defendants knew or should have known of reports of severe risks including non-Hodgkin lymphoma, with Roundup use and exposure, this information was

Electronically Filed - City of St. Louis - March 14, 2017 - 10:45 AM

strategically minimized, understated, or omitted in order to create the impression that the human dangers of Roundup were nonexistent, particularly in light of its purported utility.

208.    The fraudulent, intentional, negligent and/or innocent material misrepresentations and/or active concealment, suppression, and omissions by Defendants were perpetuated directly and/or indirectly through the advertisements, packaging, sales aids, furtive public relations efforts, and other marketing and promotional pieces authored, analyzed, created, compiled, designed, drafted, disseminated, distributed, edited, evaluated, marketed, published, and supplied by Defendants.

209.    If Plaintiffs had known the true facts concerning the risks associated with Roundup exposure, Plaintiffs would have used a safer alternative.

210.    Plaintiffs reliance upon the material misrepresentations and omissions was justified, among other reasons, because said misrepresentations and omissions were made by individuals and entities who were in a position to know the true facts concerning Roundup while Plaintiffs were not in a position to know the true facts because Defendants overstated the benefits and safety of Roundup and downplayed the risk of lymphoma, thereby inducing Plaintiffs to use the herbicide rather than safer alternatives.

211.    Federal law and the EPA do not authorize and specifically prohibit the deceptions, misrepresentations and omissions made by Defendants.

212.    As a direct and proximate result of Defendants' actions and inactions, Plaintiffs were exposed to Roundup and suffered and will continue to suffer injuries and damages, as set forth herein.

Electronically Filed - City of St. Louis - March 14, 2017 - 10:45 AM

WHEREFORE, Plaintiffs demand judgment for compensatory, treble, and punitive damages, together with interest, costs of suit, attorneys' fees, in an amount greater than Twenty-Five Thousand Dollars ($25,000.00), and all such other relief as the Court deems proper.

## COUNT VI

## LOSS OF CONSORTIUM

213.    Plaintiffs repeat and reiterate the allegations previously set forth herein.

214.    Plaintiffs and Decedants' spouses were entitled to the comfort, care, affection, companionship, services, society, advice, guidance, counsel, and consortium of their spouses.

215.    As a direct and proximate result of one or more of those wrongful acts or omissions of the Defendants described above, Plaintiffs have been and will be deprived of the comfort, care, affection, companionship, services, society, advice, guidance, counsel and consortium.

WHEREFORE, Plaintiffs demand judgment against Defendants for compensatory, treble, and punitive damages, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## COUNT VII

## WRONGFUL DEATH

216.    Plaintiffs repeat and reiterate the allegations previously set forth herein.

217.    Plaintiffs are the surviving heirs of the Decedents, or other persons authorized to bring an action for the wrongful death of the Decedents, who used Defendants' Roundup product and were injured and died as a result.

218.    The injuries and damages of Plaintiffs and Decedents were caused by the wrongful acts, omissions, and fraudulent misrepresentations of Defendants.

Electronically Filed - City of St. Louis - March 14, 2017 - 10:45 AM

219.    As a result of the conduct of Defendants and use of Defendants' Roundup product, the Decedents suffered fatal injuries.

220.    As a result of the death of the Decedents, Plaintiffs were deprived of love, companionship, comfort, support, affection, society, solace, and moral support of the Decedents.

221.    Plaintiffs are entitled to recover economic and non-economic damages against all Defendants for wrongful death directly and legally caused by the defects in Defendants' Roundup product and the negligent conduct, acts, errors, omissions and intentional and negligent misrepresentations of Defendants, and each of them.

WHEREFORE, Plaintiffs pray for judgment against Defendants as hereinafter set forth.

## LIMITATION ON ALLEGATIONS

222.    The allegations in this pleading are made pursuant to the laws of the Plaintiffs' home states. To the extent state law imposes a duty or obligation on the Defendants that exceeds those required by federal law, Plaintiffs do not assert such claims.  All claims asserted herein run parallel to federal law, i.e., the Defendants' violations of state law were also violations of federal law. Had Defendants honestly complied with state is law, they would also have complied with federal law.

223.    Additionally, Plaintiffs' claims do not seek to enforce federal law. These claims are brought under state law, notwithstanding the fact that such claims run parallel to federal law.

224.    As alleged in this pleading, Monsanto violated U.S.C. § 136j and 40 C.F.R. § 10(a)(5) by distributing Roundup, which was misbranded pursuant to 7 U.S.C. § 136(g).  Federal law specifically prohibits the distribution of a misbranded herbicide.

WHEREFORE, Plaintiff prays for judgment against Defendants for compensatory damages as set forth above and for exemplary damages for the in an amount in excess of Twenty

Electronically Filed - City of St. Louis - March 14, 2017 - 10:45 AM

Five Thousand Dollars ($25,000.00) to punish Defendants, and to deter Defendants and other businesses from like conduct, and such other and further relief as this Court deems just, proper, and equitable.

ONDER, SHELTON, O'LEARY &PETERSON, LLC

*/s/ James T. Corrigan*

James T. Corrigan      #45127
James D. O'Leary       #45964
110 E. Lockwood, 2nd Floor
St. Louis, MO 63119
corrigan@onderlaw.com
oleary@onderlaw.com
(314) 963-9000 telephone
(314) 963-1700 facsimile

*Attorneys for Plaintiffs*